Appellant, Ms. Wright, the Appellant, Mr. Coleman, the Appellant. Good morning. May it please the Court, Lisa Wright representing Mr. Jean-Paul Gamarra. I'd like to reserve two minutes for a rebuttal. The government rightly faced a high burden in seeking to forcibly medicate Mr. Gamarra in an attempt to restore his competency for trial. It had to establish four things by clear and convincing evidence, and as to the second and fourth requirements, what the government called the cell medication factors, the government did not meet its burden. Because of the grave liberty interests at stake, this Court holds the government to a high standard of proof, and here the government could have and should have done better. A couple of points about the clear error standard of review, an important aspect of which is that this Court must give due regard to the trial court's opportunity to judge written discredibility. First, because the cell evidence came in before the magistrate, this Court is in as good a position as the district court was to review the cell reports and the transcripts and determine whether the government's evidence was sufficient under the clear and convincing standard. And second, the disputed findings here were not based on factual testimony, but rather on expert opinion testimony, and such opinion testimony is not believed or disbelieved in the same way a fact finder would credit or discredit factual testimony. It's not Dr. Grady's credibility that's at issue here, but the reliability of his expert opinions based on his own explanation of what went into forming them. Here... What evidence is there contrary to any opinion that Dr. Grady expressed? Well, the fact that he had a neuromuscular incident in the past was, we would argue, speculatively and irrationally disregarded, actually in a way that was internally inconsistent with Dr. Grady's own testimony, because the previous provider, who he speculated had not believed Mr. Gamara, actually did exactly what Dr. Grady himself testified he would do if he did believe somebody had a neuromuscular side effect, which would be to titrate the dosage. The way that the defendant described it was that he had stiffness. And I think Dr. Grady said that was... But that wouldn't interfere with his competency to stand trial. Well, if it was a Parkinsonian side effect, which I think was the suggestion from Dr. Grady, that's what that sounded like. That suggests that he was in the category of people who were subject to those Parkinsonian symptoms, and I think that someone who's suffering those symptoms would be impaired, especially with the other problems that are in the record, the blood pressure incident, the hypersomnia. And the fact that he died was... Well, we don't know what he meant by that, but we do know that whatever he meant, and he may not have been very articulate, as that's one of the symptoms of his disease, explaining it, but that he feared taking risperidone over, particularly over other medication, that he had had bad experiences, and the fact that he may not have been able to articulate it. The APA guidelines say that the doctor is to consider patient's preference, and the doctor also said that risperidone had a similar side effect profile and effectiveness profile to these other antipsychotics. So the fact that he would choose risperidone over these others, it shows a disregard that really draws into question also the opinion. So let me be clear. In your brief, your argument is, as you started out here, given the government's burden, the reliability of this doctor's testimony is the only issue that you're raising. And you say in your brief he ignored evidence that your client had not in fact tolerated this drug. That's correct. He didn't ignore it, did he? I mean, he talked about it. It was in the records he reviewed. And I take you to be arguing that he didn't give adequate consideration to it, but he didn't ignore it. Well, it was my understanding he assumed that he considered that a non-factor because he said, I don't know what happened. He acted as if it hadn't happened because he said, I don't know what happened, and I have a hypothesis that it was not a credible report, but I don't know. So he treated that as a non-factor when it should have been a factor. Also, as far as we know, he paid no mind to, there was no reference to the blood pressure incident, the hypersomnia, Mr. Gamara's repeated expressions of fear of taking risperidone in particular. Ms. Wright, are you making no argument with respect to the first cell factor, whether the length of Mr. Gamara's pretrial detention is a special circumstance that weighs against the government's interest? Well, that's tricky because it's kind of a moving target in the sense that the longer he's in, you know, at some point, yes. I mean, we're now at 29 months. We're now over the high end of the guidelines. But you haven't raised that argument on appeal. Not challenging that specifically, but I think when it's true. Well, I think it's significant that you haven't. I mean, it was raised in the district court, and the district court gave his reason, but you haven't challenged that in your brief. Well, it's my understanding that that is kind of a threshold question to even consider the other factors. Is this serious? But I still think when the court is weighing ultimately the decision, how serious it is has got to play in. How serious what is? The government interest. You might have a serious enough government interest to say, yes, prong one, there is a serious government interest prong one, but then when the other prongs are very weak, and as the interest gets lesser and lesser as time passes, and they've gotten largely what they're seeking. So that's in your brief? No, that is not an argument in my brief. I guess it's implicit in my argument that they didn't ultimately meet their burden, and my argument is about the rushed. Well, I'm pressing you on this because you're an experienced fellow attorney. And when I was working on this case, I was surprised you hadn't raised it. That's your choice and decision. So you're focusing only on Dr. Grady's, the reliability of his expert opinion. Well, I think we do bring up the time and the government's interest in the sense that we talk at length about the fact that he overstayed at Butner. He was at Butner for six and a half months instead of four. There was nine months that passed between the competency finding and the cell hearing, and then the cell hearing ends up being decided on a report that was done in two days without looking at him. And I guess I feel like implicit in that is a criticism of the government's degree of interest. I'm sorry to interrupt. Sorry. But the district judge ruled on the extra time that was taken past the four months, and that also wasn't appealed, that ruling. He ruled that they had violated the statute, and we are pressing, yes, they violated the statute. But he ruled that it was not a ground for dismissal. So I also appreciate that you're in an awkward position because your client does not concede that he is incompetent. And so, for example, on the first factor, one of the things that is ñ maybe we've crossed this bridge in Dillon, but the notion of resting general deterrence, an interest in communicating to the public that these are serious offenses, on someone who was delusional when he committed the offense, it's unclear that that's a robust governmental interest. But, of course, that's not an argument that you could make. And under the third factor, which I gather you also don't challenge, the question whether involuntary medication is necessary to further the interest, there it seems, you know, one of the significant questions is, should more efforts have been made for voluntary medication, you know, to establish more of a therapeutic relationship with the defendant. And, again, that's not an argument I understand you to be in a position to make. Which raises for me, can you tell us why? I know in some of these cases there's a defense psychiatric expert not available to you. Who was not in this case? There wasn't, I know, but is that just anything you can shed light on for us? I don't have information on that. Yes. Right. We received a communication from the U.S. Marshal here that Mr. Gamar is being held in the D.C. jail. Is that correct? Yes. But the communication also indicated that a year ago he was arrested and charged with assaulting a U.S. Marshal in this court's library. Are you aware of that? Yes. So when you talk about how long he's being held, how do we know that he's being held in connection with the offenses that we're dealing with, as opposed to assault on a U.S. Marshal a year ago? And second of all, how can it be that he was out in the library court one year ago? Can you explain that to me? I think it was two years ago. I'm sorry. Well, the Marshal said a year ago. I believe it was March of 2017. So he must have been released by that time? I believe that there was an arrest warrant issued. They didn't arrest him in this courthouse. They did not arrest him at the time. And then shortly thereafter, when the offense for which he was arrested in this case happened, I believe that's when they executed the arrest warrant that had been issued. Here's my question. You said he's been in prison all this time, and yet he was in the court library a year or two years, I don't know which, at which time he assaulted a U.S. Marshal. How can that be that he's been in prison in connection with these offenses? I don't know that that case you're referring to is going forward as a criminal case. I know that the arrest was processed, but I'm not sure. You see what I'm getting at is that there's no record here, and we don't know why he's in the D.C. jail as opposed to Butner. We don't know why he was out. So I don't see how we can possibly deal with an argument that the government's interest, that you're making now for the first time without any briefing, that the government's interest is diminished. Well, I think he's at the D.C. jail. He's only authorized to be hospitalized at Butner for four months, and they already blew through that date, so he couldn't be hospitalized at Butner anymore, it's my understanding, for any kind of evaluation. So he's simply here, it's my understanding, he's waiting at the D.C. jail for this appeal. Has he been considered a danger to himself or others? Absolutely not. Even after the assault on a U.S. Marshal? It's my understanding the government has never taken that position, and I believe the reports by Demesa and other reports in the record say that he's been, they don't consider that an issue, and specifically said there's no Washington v. Harper ground for medicating him. Thanks. I want to emphasize that Dr. Grady himself limited his own testimony, and he admitted that it was limited because of what he called the unfortunate failure to examine Mr. Gamara, and we would argue that the Paoli case, for example, supports our argument that the absence of an in-person exam and taking a medical history increases the likelihood of an erroneous result, and the government's cases that it cites, they are decided on a much different burden of proof and also involved issues that were much simpler than these side effect and medical prognosis issues, which are quite nuanced. The caveats the witness placed himself, he acknowledged that this was out of 16 prior cell hearings. This is the only one where he did not meet with the defendant. He called it unfortunate. He said he had to be careful regarding opining on the medical appropriateness. The evaluation was indisputably rushed, and the truth is that this, if you really look at the timing of everything, the truth is that this medical doctor, who the government had to have to make its case on those two factors, resisted giving his opinion under these circumstances. He did not want to do what he ultimately did, which was rush this report and come. And the history, I don't know too much detail here, but there was this e-mail at the end of March, and then the prosecutor was on vacation, and the day he returned, which was a week before the scheduled hearing, he learns of Grady's response, saying, I need three weeks. I can't do it on, you know, I need a court order. So then the prosecutor the next day has to file this emergency motion with the magistrate saying, please order him to do this. And then three days later, the Friday before the Monday hearing, Judge Bates rules that he's been held too long and the government's violated the statute, and it has to be done by April 30th. So then on the Monday hearing, the prosecutor comes in still asking the magistrate, please help me get this guy here. Please make him do this report. That's on Monday the 9th, and the court says, that's your job. And so then the next day and the day after that, 10th and 11th are when he then writes this report and starts testifying. So I think what's clear is that although Grady ended up relenting and doing this rushed report without evaluating the defendant personally, he emphasized in his testimony that the question whether to forcibly medicate Mr. Kamara was what he called a moral and legal question, and that he wasn't opining on that. He was simply giving the court medical information. And I think that seems that that's how he justified in his mind going ahead and testifying under these, you know, unfortunate circumstances. I have a question relevant to that. There was some discussion in the lower court about the medical ethics rules, the American Psychiatric Association principles of medical ethics. And I think Judge Bates determined that the ethical rule that was cited was not relevant because it spoke to someone who is in the light of public attention. But looking at that very set of rules, that was number, principle number three. But there's another principle just below that, number four, is why you don't rely on it, which says that the psychiatrist may permit his or her certification to be used for the involuntary treatment of any person only following his or her personal examination of that person. To do so, he or she must find that the person, because of mental illness, cannot form a judgment as to what is in his or her own best interest, and that without such treatment, substantial impairment is likely to occur to the person or others. So it's a process question. It's not a question, as in some of our prior cases, about whether medical ethics would trump what the law demands, but it's a question about the process under which an individual can testify. And I'm curious whether you repudiate the relevance of that. No. I will just say I missed that. I have to look at that and see that if that is referring to the kind of testimony that Dr. Grady gave, then yes, that would be an authority that would be meaningful. That provision deals with civil commitment. And the involuntary treatment means that the person is taken from their home or wherever and put into an asylum, we used to call it, or a hospital. And that's not the situation we have here. And, in fact, the situation we have here is a psychiatrist testifying from not on the basis of a personal examination, but on the basis of records, correct? Right. And at least in 2017 and 2018, the APA guidance was that that was ethical. In fact, they said just that. And Judge Bates quoted that. So I don't see that there's an ethical problem. We're not arguing that it's an ethical violation. And I think to the extent that that .4 is about civil, it may not technically be a violation. I don't have to look at it. But it certainly reflects on what the APA thinks is appropriate in making these kinds of decisions. There used to be a time. I think that's a very – my guess is it's an old provision, because there used to be a time in this country where state by state a psychiatrist could certify somebody as being mentally ill, and the authorities would come and take the person away, and maybe there would be a hearing afterwards, but it was pretty perfunctory. But most of the states have now done away with that because of a series of decisions by the Supreme Court regarding due process hearings before the commitment. Right. But certainly under Sell and Dillon, that's obviously not the procedure of that. The government had to turn square corners here under those opinions. So I guess on my point about Dr. Grady pointing out that it's a moral and legal question and kind of saying, like, I'm just here to give you this information that I have. Here's my cell appendix that I give in every case. And I guess I would say to the court, this is a moral and legal question, and this court, you know, can decide – you know, needs to decide, like, what standard are we holding the government to here? There's other reliability questions. So your rule would be that in order to order this type of medication, there must be a personal interview by someone the government is relying on for an expert opinion? Well, on the medication factors, they need a doctor, an M.D. And I don't know that we don't need a bright line like that in order to prevail here because there's a lot of problems with Dr. Grady's testimony. So I'm trying to understand what they are. Well – You said he ignored two things. All right? And we know he didn't ignore. He may not have given what you'd consider appropriate weight. But he reviewed the medical records. Well, he irrationally set aside the most important – Irrationally? Yes, because he set it aside for a reason that was internally inconsistent with his own testimony. It really made no sense that he was not crediting that, given that he said that if someone said that to him, he would do exactly what that provider did. So it's really speculation by him, and he does set it aside. He may have looked at it, but then he puts it completely aside. And the government's answer to this, that these could be products of delusion, is obviously a circular and also internally inconsistent in the sense that he was on a therapeutic dose of this risperidone at the time that he made this report. And the government's arguing that this resolves delusions. So sort of having it both ways there just makes no sense. Ms. Wright, I just have a process question. We're in a position now where Judge Bates has authorized involuntary medication, and the record is clear that there is a one-in-four chance, according to the data that Dr. Grady testified about, that it will not restore him to competence. And there's also a substantial portion of people put on these medications – there's reason to believe Mr. Gamara might be among them – who do suffer side effects. And then there's a question mark whether those side effects would interfere with Mr. Gamara's right to a fair trial. And my process question is, how is the evaluation made, and by whom, whether a patient is in fact restored, and whether whatever side effects he is manifesting are such that would interfere with his right to a fair trial? I gather – I mean, are we in a situation where the court has given the last word and that's up to the prosecutor? I think – I guess I've been assuming, perhaps wrongly, that it would be left to the Butner people, although that's one of the problems here that we've pointed out, is that he's not going to be a Butner for the trial. But presumably he would be restored to competency on some kind of long-acting psychotropic medication and brought here within the period when that medication was still acting. But he's only two weeks, I think. It's just not clear to me who passes on that and whether there's any record of that. And that could change over time. My problem with it, too, is that the symptoms, the side effects can change. It's like they're cumulative. The Parkinsonian in particular, the longer you're on it, the more likelihood that it's going to get worse. And so they may send him from Butner and he's having mild stiffness or less than stiffness, but then he gets along the way – we haven't had actually a cell hearing where the government has met its burden of proof of showing that anyone other than Butner can manage these symptoms. So I think there's a lot of problems with the government's argument that, don't worry, we've shown that anything can be managed. That can't be the rule. It can't be the rule that the doctor can just say, whatever, we'll just try things, and if something bad happens, we'll just fix it. That can't be the rule. And I don't understand how he can leave Butner if their whole side effect management, which Judge Bates relied on heavily, is keyed specifically to Butner's special expertise, special staffing, and uniquely positioned reassurances about how, don't worry, we can handle it. Then he's going to be in transit, and at the DC jail, for goodness knows how long. If there's a trial, there's going to be a long period of preparation and whatnot, and he's going to be sitting over there. The government cites a case saying they have a psychiatrist there, but that's not what Dr. Grady testified was going to be provided. He talked about the clinical pharmacist and all the monitoring. So we don't think that's an answer at all. All right, why don't you save the rest. Good morning. Appellant has not met his burden of showing that Judge Bates clearly erred in finding that the second and fourth cell factors were met in this case. I respectfully disagree with counsel that essentially this Court should ignore Judge Bates' rulings and look solely to the magistrate. It was not the magistrate who made the rulings, ultimately. It is the district court's judgment, and that was the one made by Judge Bates. As I understood her point, she was saying that whether it was, not that we should give special weight to any findings by the magistrate, but that we should just look at the record because Judge Bates was not in any better position than we are because he was ruling on a cold record. And I'm not sure he made factual findings in any event. Well, he did make factual findings. He has to find by clear and convincing evidence that these factors are met. He makes it on the basis of findings in his review of the record. Ultimately, it is Appellant's burden to show that he clearly erred in making these findings, and we respectfully submit that that hasn't been shown here. In essence, it seems to me that Appellant is arguing that Dr. Grady must have conducted a personal interview of Appellant before he could render the medical opinion that he did. We submit that, again, if Appellant doesn't seem to dispute, that a medical expert can, in fact, give a reliable medical opinion on the basis of a review of medical records. And here, that is what Dr. Grady did. Dr. Grady also reviewed the extensive reports of Dr. DeMaisa, and then Ms. Laxton and Dr. Dubois, who had conducted numerous personal interviews of Appellant, had observed his condition, diagnosed him as suffering from either schizoaffective disorder or schizophrenia, and had also opined themselves that Appellant was likely going to need medication to be able to be restored to confidence. That's true, Your Honor, but again, I'm not aware of any other legal context in which a court has held that a medical doctor must perform a personal examination of a patient before rendering a reliable medical opinion. And if that's the case, then it's hard to see why Judge Bates couldn't rely on his opinion plus all of the other testimony and reports in the record of, you know, again, these are psychological experts. These are people who are Ph.D.s in psychology who have observed him. Mr. Coleman, the record leaves me uncertain as to who was engaging with Mr. Gamar as an observer and who was engaging with him as a doctor or as a medical professional involved in treatment. From Mr. Grady's testimony, he talks about relying on the pharmacist's reports, that that was his mode of monitoring the situation, Mr. Gamara. And he really doesn't talk about, I mean, he talks about the information in the Laxon and Dubois report, but can you clarify for us, the Laxon and Dubois task was to observe and report, or were they also in a treating role? Who was engaging in a treatment role with this individual over the six months? So the persons who were trying to treat him were at the Butner Institute, and this is certainly Dr. Dubois and Ms. Laxon under his supervision. They were attempting to see if his competency could be restored, sort of essentially while at the facility without an involuntary medication order. You do have Dr. Inman, the clinical pharmacist, who, you know, based on his voluntary acceptance of a certain amount of, it looks like just Seroquel, on a very intermittent basis, they're also trying to see, you know, based on his voluntary acceptance, what they can do. What they determined, you know, again, it's their report to the court that says, this has failed. And... So that's my question, is were they in a treating role with respect to him? I mean, and I'm partly going off of your brief, which says that Dr. Grady believed that individual therapy, along with medication, was ideal. And I'm trying to understand, I mean, I read the record, and I know that there was a question whether individual therapy could substitute for medication, and that Mr. Grady doesn't want medication, right? And he hasn't challenged the third cell factor. But the government's responsibility is nonetheless to meet that factor. And I just am having trouble understanding what in the record shows, for example, that there was someone establishing a therapeutic relationship with this individual to the extent that that might have been possible, that then could have aided voluntary psychotropic medication. And I just don't have a clear sense of who was in that role. And when they say they're giving Seroquel as needed, is that like he's supposed to swing by the pharmacy if he wants it? I mean, I just don't have a sense of that situation. In terms of his acceptance of medication, I think what you can definitely tell from the record is, when he arrived, Dr. Dubois and Ms. Laxton, they are the ones responsible for trying to see whether or not he can be restored to confidence. They are trying, in a sense that is a kind of treatment, and what you can tell, what they both described in their testimony and in their report was numerous efforts to try to, as they said, sort of see if they could talk him out of his beliefs and his resistance to taking medication. They tried to sort of challenge his various, you know, essentially irrational beliefs about what was going on, whether medication would help him. Those efforts were unsuccessful, as they said. Do we know whether they're doing that in like an interviewer capacity? The thing that made me wonder about this is the way that Dr. Grady really talks about the person on the scene being the pharmacist. He doesn't talk about the person on the scene giving the in-person treatment, being Dubois and his intern. I think we're mixing two different things here. One is what the psychologists are trying to do. The pharmacist has been declared incompetent and that he's been diagnosed as suffering from schizoaffective disorder, I think. They are trying to determine whether or not, A, whether they agree with that diagnosis. They also, they are using whatever methods they have in terms of, as they said, trying to challenge his beliefs. Now, whether that rose to the level of what the magistrate wanted in terms of sort of talk therapy, again, that was an issue that was presented to the district court. Judge Bates determined that it was not necessary to try to sort of some regime of talk therapy. It has not been challenged on appeal. Again, we haven't briefed it. We believe it's been abandoned. At that point, it's not really properly before the court. In terms of going forward, in terms of pharmaceutical treatment, in other words, the actual drugs, what we know about what has been administered is certainly what's reflected in Dr. Enman's notes, because she was the one who actually administered the Seroquel. I think what Dr. Grady says is that if the order for involuntary medication is ultimately presented, then what he says is, look, he's going to work with the clinical pharmacist and get reports from her, and essentially trying to determine, sort of try to figure out what regime of medications would work. There was a question, I think, raised during appellant's argument as to what sort of the process is going forward. And I think it's, if you look at Judge Bates's order, which is on page 210 of the, I think, volume one of the appendix, what it shows is that, you know, the district court orders the medical staff at Butner to involuntary medicate appellant, and then basically says, I want a report every 30 days detailing the progress. So it's clear that there's going to be ongoing monitoring by the court. And Dr. Grady... Right, right. So right now nothing is happening. That's correct. So this order, this is what would happen if, as we respectfully submit, this court were to affirm his order, then ultimately he would be able, once the case returned to his jurisdiction, he'd be able to lift that stay, and this order would then go into effect. Right now nothing is happening. That's correct. But what would happen... All right. So my understanding is that the incident involving the marshal, that there is a case in the D.C. Superior Court relating to that, but it is trailing this case. In other words, it is sort of in a holding pattern while this case proceeds. This threat that he made at the White House against... I believe it was the current president, Your Honor. But there's evidence that I heard. I also read that he made a threat against President Obama. That was some years earlier. So I believe he was held. I don't know what the ultimate legal outcome was of that case. I'm sorry. I'm not sure. It doesn't appear to me from the record that it ever resulted in a conviction, but I don't know that for certain. But yes, he was hospitalized in the context of that case after making a threat against the previous president. Yes. So back to Judge Randolph's earlier question, what is he being... Under what authority is he currently being held? Okay. So my understanding is that at the beginning of this case, he was held, you know, at the preliminary hearing as a danger to... essentially based on the danger of the offense. And Judge Bates didn't have a problem with the fact that the time had expired at that point when he was ruling. Well, Judge Bates, it's not... I think if you look at it when respecting that part of the order, which of course is not on appeal, he did express concern about the fact that at this point... And he recognized that, look, appellant has now been held longer than his guidelines range would be. But he said appellant was at fault. He did say that, look, to some extent because he is sort of demanding all of these legal proceedings, which is his right, but of course it does naturally extend the length of the proceedings. But he also said that there was an interest in... No, my understanding is that the incident with the marshal occurred before this one. So that case was in a sense sort of already in the works when this incident happened. That's my understanding. So is it correct, is the government representing the court that Mr. Gamara is now being held in connection with the determination that he is incompetent to stand trial? My understanding is that he's not being held because of his incompetency per se. He's being held in this case on the basis of whatever findings were made. Again, I don't have that order in front of me, so I don't want to speak... But is he being held, as it were, pursuant to Judge Bates' determination? I believe, yes. It is the district court that is currently holding him. I don't believe it is the superior court that on sort of separate authority is holding him. That's my understanding. Again, that is not an issue that has been presented here today, so obviously we haven't briefed him. Given that Mr. Gamara, for example, because he denies that he needs the medication, wouldn't argue for a less intrusive way of administering it? Or Seroquel rather than Risperidol? Does Seroquel come in a long-acting injectable form? I don't know the answer to that. I'm not being a medical professional myself. I know only limited things about how these drugs work and what they do and how exactly they are administered. And of course the reason that I'm asking is because he expressed a specific aversion to and in fact had side effects on Risperidol and expressed the most amenability to and was to some limited degree more compliant on Seroquel. And so one wonders why Dr. Grady would say to the extent that he says anything about what the treatment is, I would start him on long-acting Risperidol. There are, I think, two very good reasons. Dr. Grady points out that he's not just sort of pulling Risperidol out of a hat. Based on his review of the medical records, it appeared to be the most effective treatment to sort of restore a patient's mental health. With respect to Seroquel, the second problem is that although a patient seems to be willing to sort of take Seroquel on a very intermittent basis, as he says, just to help him sleep, it doesn't appear, you know, you can see from his records that at times he accepts only sub-therapeutic doses and others very small doses. He doesn't seem to be willing to engage in sort of like a long-term, very consistent plan of consistently taking it. So because of that, really, although he may be more amenable to Seroquel, it's with conditions. Namely, it's only when he wants to take it and only a few days. But I think you appreciate that my question is, if one of the factors that Dr. Grady says is relevant is the patient's relative preference, and Dr. Grady says these various psychotropic medications are roughly equally effective, then, you know, just as a matter of the responsibility of the government, wouldn't it be, like, why has he not chosen the one where there hasn't been a record of side effects? And that the patient, you know, under protest, granted, but that the patient has been relatively open to and hasn't had the delusion that he died on. Again, so I don't think that during the self-hearing Dr. Grady was cross-examined on this point. In other words, why not just take Seroquel instead of that? And again, I can't put words in his mouth, not being a medical professional, being able to say why, that for someone in a Pellant's condition, why Seroquel would not be as effective as Risperidone. What we can see, I think, from the record and what Dr. Grady says is that looking at his treatment history, looking at, you know, he's been treated for a number of years. I think it's almost a decade's worth of medical records apparently that he's looking at. And it appears that Risperidone is the one that he actually, in terms of it having the best effect of restoring his mental health, that's the medication that has worked the best. He's taken a number of other medications, Seroquel being one of them. But again, you know, I think Dr. Grady's indication was that from his review of the records it was Risperidone that he would start with. But I think it's also important to note, Dr. Grady doesn't say, and certainly the order is not just Risperidone and nothing else. In other words, we're not going to do anything else. He says, look, we're going to start, that's what I would start with. But he also says, I'm going to work with the patient and we're going to try to see what works best. And if we have to change medications or if we have to change dosages, that's something that can be done. In addition, Dr. Grady says, we'll look at what side effects may manifest themselves and try to adequately deal with those. I appreciate that, and it's very difficult to sort of navigate the interplay between the court's responsibility and the lawyer's responsibility on the one hand and the medical expertise on the other. But there is, the order here basically gives carte blanche to Butner to treat this man. There's no time limit, there's no dosage limit, there's nothing really explaining how side effects would be addressed. For example, I have a question, if somebody's given a two-week long injection, Dr. Grady says, oh, we would manage the side effects. We would take him off something if he had side effects. But presumably if you have two weeks' worth of a psychotropic medication in your system, you can't be taken off that tomorrow. So the lack of detail in contrast to the orders that I've seen in some of the other cases in other circuits, I find concerning. And I just would be interested in hearing from you about that. Well, the appellant hasn't challenged sort of the content of the order here. In other words, it's just the basis for even giving it. I would say that I could imagine some district judges wanting to take a little bit more of a sort of a helicopter approach and sort of micromanage the medical professionals. I could also, however, imagine that Judge Bates doesn't feel like that's something that he can sort of do. And I think also there is a risk, I think, to sort of tying the hands of the medical professional and saying, like, I'm only going to allow this medication without a basis for saying why, or that it's going to be at this dosage, et cetera. And I think to the extent that appellant wanted that kind of sort of leash to be put on the medical professionals at Butner, he could have introduced his own medical expert if he had wanted to. He could have tried to put in records saying that, look, anything, this particular drug over this amount, you should forbid them from doing. But again, that wasn't done here. And I think the... But I just wonder as a matter of the affirmative obligations of the government and how we can really make sense of a cell hearing that is done without the specifics in place. And again, I just, I think that that sort of, that tension, I think, between sort of wanting to have a judge sort of manage this, I think is addressed by the fact that that's why Judge Bates wants a report every 30 days detailing what, you know, essentially what is being done and what the results are. Appellant will also be... The statute doesn't provide a limit. Right. It doesn't. And the order doesn't provide a limit. Right. But I think it is, I don't think that it would be fair to assume that, you know, the district court here is simply going to allow indefinite treatment. And certainly if that became an issue down the road, appellant would certainly be able to seek legal redress. If he didn't get the relief he wanted from the district court, he could come to this court again and ask for it to be reviewed. So it's not as if he's simply going into sort of like a black hole from which, you know, he will never return. I don't think that that is what's going on here. And do you have a sense of, is it when he appears in court or is it Butner that makes the determination, A, he's in the 25 percent of patients for whom Corporate may be approved for court and has sort of tics or neuromuscular facial grimacing that's going to really just impede his ability to appear in a non-bizarre way for a jury? How does all that cash out just as a process matter? So I think what happens is, you know, you have these periods of 30 days at a time in which, there are these punctuated by 30-day reports in which the medical professionals attempt to sort of use medication to restore competence. At some point, they will be able to say whether it's going to work or not. If they believe that it works, they submit a report to the court saying, we find him competent. Then it comes back to the court, and the court has to make the determination whether it agrees. I mean, that's not a final determination. It's only the court who ultimately can make the finding, he is competent or not. That could be challenged by appellant's counsel, or they could go along with it. You know, there's a hearing as to whether or not he's competent or not. Presumably, to the extent that there are side effects that are interfering with competence, or the ability essentially to proceed to trial, that is presumably something that an appellant could talk to his own counsel about. It would be up to counsel then, I think, to raise it with the court as why ultimately the medications aren't doing. In fact, the side effects are actually interfering with that. At this stage of the proceedings, I just think that it's somewhat speculative as to what will happen. I think ultimately, in order to know whether it's going to work, it has to be tried.  And certainly, right now, we know that appellant is not competent, and the case cannot proceed. I think, again, I do want to assure the court that my understanding is this isn't going to be some sort of just open-ended blank check, as to which appellant will never have any remedy. That's, I think, definitely not the case. And there's every indication that Judge Bates intends to keep monitoring this situation, to make sure that it doesn't drag on too long, or that it doesn't have the effect that it's supposed to. I realize I've kept you far over your time, and I apologize. But just on that initial question about the government's interest, clearly the government has an interest in prosecuting such serious offenses as threats on the life of the President, as the putative use of explosives involving potentially nuclear matter. I mean, there's just not – nobody's debated that. I think the questions come more to the amount of time this individual has been imprisoned. And the general deterrence interest is an interest in projecting, you know, this can't go on, but where you have an individual who's delusional, it feels unseemly. I mean, I don't know how else to say it, to use a prosecution of such a person to communicate to the rest of the public that this is something that will not be tolerated. And I just – given that you're, you know, representing the government here, whether you have any comment on that. So, obviously, as you recognize, it hasn't been briefed. So, I mean, I think the – certainly cases like this are obviously very difficult to deal with when you have somebody with a severe mental illness like this. At the same time, severe mental illnesses can also lead to, you know, crimes much more serious than this. And so it's obviously very difficult for, you know, law enforcement authorities, in particular, who deal with this on the ground, for courts, I think, certainly for prosecutors, but also for, you know, medical professionals within the prison system to try to sort of balance all of these concerns. I think here, because so much, you know, attention is being paid to make sure that appellants' rights are respected, that the process goes through, it is extending these proceedings. It is extending them for a very long time. You know, I don't think anybody can cast blame here. It's just how that it's worked out. And it just takes time for these legal proceedings to wind their way through the court system and to come to a full resolution, including before this court. I don't think that a hard and fast rule of, well, these sorts of, you know, we're not going to have self-proceedings for these kinds of offenses because they aren't serious enough, I think that would be unwise. And I think, again, it will create sort of dilemmas like this case. But in the end, you know, I think it's just sort of what comes from, you know, the fact that we take self-proceedings so seriously and that they do take a lot of time. And he's not been deemed incompetent to make his own medical decisions. I mean, that's another thing that's puzzling to the, you know... Right. Well, in a sense, that's what the cell hearing does. That's ultimately what the cell hearing does in the context of a criminal case. It ultimately says, no, you know, you're going to have to be involuntarily medicated. And it follows a lot of the same law that I think was there. Thank you. And I do apologize for the amount of time. Thank you. Is there no further questions? So I can't answer that question at this stage because we obviously still think in the first instance that, you know, the criminal proceedings should go forward. Obviously, if we couldn't do that. I'm sorry, Your Honor. The government told Judge Bates at the time he was addressing this. Now, they're further down the road. And I just want to know what the government's position is. I don't think that I can answer that question just yet. I think that was in the context of whether or not the government would be willing to abandon its criminal proceedings at the time rather than go through the cell process and instead go through with civil commitment. I'm not sure that that remark was that, you know, if the civil, if the criminal proceedings were closed off. I'm not prepared here sort of to say that, and it certainly wouldn't be my decision to make, that if this court were to disagree, if no involuntary medication could be done, and ultimately we're at a standstill that nothing more would happen, that I'm just, I'm not sure what those who have that authority would decide to do. If there are no further questions, we respectfully submit to the judgment. Well, I certainly haven't gone out and asked for that. Thank you. I can make a few points. I mean, I don't think that there's any specific benefits of a medication. That's his training. The other people aren't trained in that. And I want to point out that Laxton and Dubois, although the defendant talked to them, they noted that he expressed concerns about revealing private medical history and symptoms with them, and that, you know, he should have had the opportunity to provide those things with the medical doctor who was the person in whose care he was. But that seems, I mean, that's irrational, but I guess it is his view. I mean, that he would have a doctor-patient confidentiality just as much with these two as he would with Grady. But they're also not experts in the kind of things, the medication issues that he might be talking about. But that's a different point. You're talking about a privacy concern, which I guess I'm saying he had that concern. I want to point out that the prosecutor did acknowledge that this was a shorter timetable than is normal, given the issues. And that's what we're focusing on is the seriousness of what's going on here. Also, the district court's opinion was infected with the speculative discounting of the neuromuscular by Grady, because the court said that notwithstanding the risk of side effects, including the possibility that Mr. Gamara might experience neuromuscular side effects, that's what the court relied on. But the thing was that that sort of assumes that Grady credited it. And, in fact, he didn't. There was more than a possibility, based on Grady's testimony, you know, if you look at the earlier testimony of Grady. I wanted to say, I didn't get a chance to say about the medical appropriateness prong, that the doctor had to balance the benefit versus the suffering. And he actually appeared to sort of misunderstand that inquiry and that equation when he basically justified the medical appropriateness by saying if a patient in the community came to me, when that's not at all analogous, because when someone's seeking treatment, the benefit to them weighs differently than when someone thinks that he's not getting a benefit. It's not that the doctor couldn't override it, but to say, well, it's advertised on TV as safe and effective, that's just not medically, that's not what's needed. Regarding prong one, what we're not disputing is that a threat to the president is a serious offense. That I'm not disputing. But what we have raised is the length of time he was held, that there was a statutory violation, and how long it would be before this is over. And I guess I would argue that what's substantial enough evidence under the other prongs is affected by the government's interest, which is weakening by the day. And last, I guess, what we're saying overall, and this ties into prong one, is this is just way too serious, this is not the way that the government should be doing this, that if the United States wants to inject a citizen with a harmful substance, they have to do better, and maybe they got 90% of the way here, but they didn't get over the clear and convincing line, and we would ask the court to reverse Judge Bates' ruling and find clear error.
judges: Rogers, Pillard, Randolph